Filed 1/29/21  P. v. White CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C083308 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 62138508A, 62138508B, 62138508C) |
| v. | |
| TRENTON MICHAEL WHITE et al., | |
| Defendants and Appellants. | |

Defendants Trenton Michael White, Alexander Tyler Gove, and Jacob Orion Mitchell[1] attacked the manager at a Red Robin restaurant in Lincoln following a dispute over an underage member of their party drinking alcohol.  They were charged with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)—count one),[2] assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)—count two), battery with

---

[1]     Mitchell's appeal was dismissed after he declined to file an opening brief.

[2]     Undesignated statutory references are to the Penal Code.

serious bodily injury (§ 243, subd. (d)—count three), misdemeanor vandalism (§ 594, subd. (b)(2)(A)—count four), and misdemeanor defrauding an innkeeper (§ 537, subd. (a)(1)—count five), with enhancements for personally inflicting great bodily injury (§ 12022.7, subd. (a)) for both assault counts. After making oral and written waivers, the defendants were all represented by the same trial counsel. Following a jury trial, defendants were each convicted of the lesser included offense of simple assault (§ 240) in count one, assault with a deadly weapon in count two, the lesser included offense of simple battery (§ 242) in count three, and misdemeanor vandalism in count four. The trial court sentenced White to three years in state prison, Gove to a two-year prison term, and placed Mitchell on three years' formal probation.

White and Gove contend on appeal that trial counsel's conflicting interests deprived him of a fair trial and effective assistance, the trial court had a sua sponte duty to remove counsel when the conflict became apparent, and sentencing on the simple assault and simple battery counts should have been stayed pursuant to section 654. White contends the court erred in denying his mistrial motion based on the prosecutor's discovery abuse and misleading the trial court in pretrial rulings, the prosecutor's improper questioning during cross-examination and improper argument during closing deprived him of a fair trial, and allowing his impeachment with three prior felony weapon possession convictions violated due process.

Gove contends the simple assault conviction in count one must be reversed as a lesser included offense of the section 245 conviction in count two and reversing count one requires the fines and fees be recalculated.

We shall reverse the conviction for both defendants in count one under the lesser included offense exception to the multiple conviction rule and modify the judgment to stay sentencing on simple battery in count three. Defendants properly waived their right to conflict-free counsel and the trial court was not under a sua sponte duty to appoint independent counsel for both of them. The questions and arguments of the prosecutor at

issue here either were not improper or were not prejudicial. White was properly impeached with three prior convictions for unlawful weapon possession. We shall affirm the judgment as modified.

BACKGROUND

*Prosecution Case*

On June 4, 2015, Chris L. was the manager of the Red Robin restaurant in Lincoln. It had a separate bar area for patrons aged 21 and over. The bar had one large booth with rounded corners, known as table 14.

At some point that evening, Patricia Fernandez, who was a waitress at the restaurant, told him an underage person was drinking at table 14. Fernandez said she asked the customer for identification when he first sat down; when he could not provide identification, she told the customer he could not drink or order alcohol.

Chris L. walked to table 14. Sitting there were a woman, the three defendants, and an older man who clearly was not underage. Mitchell sat in the middle, with White and Gove on one side and the older man and the woman on the other.

Chris L. said, "Hey, how we doing?" and asked Mitchell if he had taken a drink of beer. Mitchell said nothing; either Gove or White replied in an aggressive manner, "Yeah, he did, and there's nothing you can do about it. He's been doing it all night." Chris L. explained to the party that he was the manager and they had to leave. Either Gove or White replied that he was going to finish his beer and then kick Chris L.'s "fucking ass." The person who made the threat then stood up, lowered his shoulder, and charged at Chris L.

Chris L. sidestepped his attacker and pushed him away, causing the two to fall on an adjacent table. Another man, either White or Gove, jumped on Chris L.'s back and began hitting him, causing his glasses to fly off. Chris L., who did not strike back, was able to get up, whereupon he was attacked and forced to the ground. He could feel multiple people jumping on his back and hitting him. He tried to cover up, but punches

3

coming from all areas struck him in the head. The attack ended after someone intervened and the assailants fled. He sustained a cut ear and broken glass in his knee, as well as bruising around the eye. The wound to the ear required stitches.

Unlike Chris L., Fernandez could not remember that an older man was sitting at the table and she thought Mitchell sat at one end of the booth. White, Gove, and Mitchell sat at the booth with the woman. Mitchell arrived last; he ordered a 22-ounce beer like his companions had. Fernandez asked Mitchell for identification; when he claimed to have left it at home, Fernandez said she could not serve him.

As the evening progressed, Fernandez saw Mitchell drinking a beer on the table on two separate occasions. Fernandez warned Mitchell not to drink any alcohol after the first instance, but the men in the group reacted poorly, with one standing up and yelling at her. After Mitchell drank a second time, Fernandez and her supervisor Kelika Garza warned Mitchell and informed Chris L. The male occupants of the booth were outraged after Garza's warning.

Fernandez kept watch of the booth while Chris L. asked Mitchell to stop drinking because he was underage. Mitchell replied he would stop when he finished his beer. Chris L. retorted, "No, you know what, the bill is on us, please leave." White and Gove eventually jumped Chris L., with one of them punching him in the head. Chris L. threw no punches and made no aggressive movements. He fell on the table after getting hit in the chest, whereupon the men kept striking him with their fists. Fernandez ran to the kitchen to call 911 on her cell phone. Upon returning, she saw Mitchell grab a broken beer glass and strike Chris L. in the head with it, cutting his ear. The beating ended and the attackers fled after a restaurant employee used a barstool to break up the assault.

Garza worked as a supervisor at the Red Robin that evening. Seated at the horseshoe-shaped table were, from left to right, the older man, a woman, Mitchell, White, and Gove. She had told Mitchell he could not drink but later found out from Fernandez that Mitchell kept drinking. She and Fernandez talked to Chris L., who went to the

4

booth. Gove struck Chris L. in the chest with his shoulder; Chris L. maneuvered towards another table and fell. He stood up but returned to the ground, after which the three defendants attacked him, jumping and stomping on Chris L. with their feet. Chris L. did not throw any punches.

Jake Tucker was busing tables and running drinks for the bartender that night, when he noticed Chris L. talking to what seemed like irritated customers at table 14. A man, a woman, White, Gove, and Mitchell occupied table 14. One of the men at the table suddenly pushed Chris L. with his shoulder and caused Chris L. to stumble into a nearby table; Chris L. probably nudged the man back. Next, the men were on Chris L., pummeling him with their hands and kicking Chris L., who was just "basically taking it." Chris L. never swung at his assailants, and his glasses were knocked off his face. One of the attackers picked up a glass and swung it at Chris L. The assailants fled when a bystander intervened with a barstool.

Julia Reagan was waiting tables that night when she saw all three defendants holding broken glassware and attacking the fallen Chris L. They moved the glasses in a forward fashion towards Chris L. and kept up the attack until an older gentleman grabbed a chair and wedged them off of him.

Lincoln Police Officer Wesley Collins responded to the incident at 10:00 p.m. A table and bar stools were knocked over; there was a hat in the bar area. Fernandez identified a photo of Gove and said he threw the first punch, but she made no reference to Gove using his shoulder. She said all of the assailants were punching Chris L. Reagan told Officer Collins that she could not tell how many times the assailants stabbed Chris L. because they repeatedly jabbed him with glass in an extremely fast motion.

When arrested, Gove had an injury to his head that he sustained during the incident.

5

*The Defense*

Testifying on his own behalf, White admitted going to the Red Robin that day with his older brother Paul, Paul's girlfriend Becky, White's brother-in-law Gove, and his younger brother's friend Mitchell. While Gove and Mitchell were underage, they went to this Red Robin because they knew they would be served alcohol there. They drank and ate for a couple of hours until Fernandez asked for Mitchell's identification and accused Gove of giving beer to Mitchell.

Gove took the beer from Mitchell but slid it back after Fernandez walked away. After Garza spoke to them, Chris L. told White he had to leave because he served beer to a minor. White argued he did nothing wrong, then he and Chris L. began swearing at each other. White got up to leave, but the much larger Chris L. grabbed him by the throat, which caused the beer glasses to come crashing down. White punched Chris L. in the eye, while about four Red Robin employees joined the fray. Now afraid for himself and his party, he just wanted to get them out of there. Seeing Gove drenched in blood from a head wound, they left so he could get medical attention. White never saw Gove or Mitchell throw a punch.

*Rebuttal*

According to Officer Collins, upon being arrested and making a *Miranda*[3] waiver, White stated that Gove started the fight. He never said Chris L. was the aggressor nor claimed that Chris L. grabbed White or anyone else by the neck.

---

**3**      *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

6

DISCUSSION

I

*Same Counsel for all Defendants*

Raising essentially identical arguments, both White and Gove contend having all three defendants represented by the same counsel deprived them of a fair trial and effective assistance of counsel.

A.  *Joint Representation*

On June 18, 2015, before the preliminary hearing, all three defendants submitted signed waivers of any conflict of interest in being jointly represented by attorney Jesse Ortiz.

The waiver declared that, while differences may exist or become evident during representation, joint representation in the criminal case against them was in their individual and mutual interests.  It further stated:

"Potential conflicts of interest may arise as a result of trial tactics or testimony, during closing arguments, and during sentencing; confidentiality issues; unfair outcome to one or all clients; one client may choose to accept a plea bargain; one client may be offered a plea bargain in exchange for testifying against the other client or other cooperation with the prosecution; inability to challenge evidence prejudicial to one client, yet helpful to another; inability to argue aggravating factors of other clients at sentencing or trial; one client's confession may implicate the other client; potential waste of time and resources if attorney must withdrawal late in the proceedings."

The waiver also stated that counsel could withdraw if continued representation would adversely affect one of them and advised them to seek independent legal advice regarding joint representation.

Upon receipt of the waiver, the trial court relieved appointed counsel for all three defendants and allowed Ortiz to jointly represent them.

7

On February 8, 2016, with the preliminary hearing still pending, the prosecutor filed a motion to appoint counsel to obtain a fully informed waiver of the conflict of interest. The trial court granted the motion on February 24, 2016, and appointed each defendant an attorney to advise him regarding any conflict of interest.

Following consultation with their respective appointed counsel, defendants reiterated their waiver on March 9, 2016. At this hearing, appointed counsel for Mitchell, Assistant Public Defender Martin Jones, told the court: "I read the discovery, Judge. I was able to get the discovery and review it, and I looked at a couple of possible defenses. And, to me, depending on the defense as asserted, there is more or less of a chance of a conflict. I—my understanding is, speaking to Mr. Mitchell, that the defense that is intended is the defense that presents the least chance of a conflict of interest between the codefendants. I explained my—to Mr. Mitchell the possibility of a conflict of interest that may arise at sentencing, or, depending on the defense that's asserted, that one client maybe has the advantage against the other client—the other defendants. And I asked him if he had any questions about that, and he said that he didn't, told me that he was happy being represented by Mr. Ortiz." Mitchell affirmed the veracity of this statement.

Gove's appointed counsel, conflict counsel Dan Koukol, next gave the following statement: "Your Honor, same situation, really, as to Mr. Gove. I spoke with him regarding the potential for factual conflicts of interest regarding the facts of the case and also regarding the issues that go to the rights at sentencing regarding potential mitigation arguments. He recognized the potential for conflicts, again, has indicated to me that the most likely factual argument would be—have the least amount of conflict potential. Regarding the sentencing issues, not as true, but he wanted to stay the course with Mr. Ortiz." Gove likewise affirmed the veracity of the conflict counsel's statement and that he fully knew the issues.

White's appointed counsel, conflict counsel Barry Zimmerman, told the court: "Your Honor, I did meet with Mr. White just before court today, and he and I had a

8

lengthy discussion about the facts of the case, the police reports, statements that were made. I related to him the potential conflicts that existed. He spoke with Mr. Ortiz subsequently privately. [¶] My understanding is that Mr. White understands the potential conflicts that exist, the potential conflicting defenses that might exist, and I think they do exist in this case potentially, but he wants to waive those and he wants to be represented by Mr. Ortiz." White affirmed this was true. Asked by the court, "You feel you fully understand all the consequences and the potential pitfalls of having one attorney represent everybody," White responded, "Yes, sir." After Gove and Mitchell also affirmed understanding and agreeing with the court's statement, the trial court accepted the waivers and allowed Ortiz to represent them.

A different judge, the Honorable Charles Wachob, presided over the trial. On August 22, 2016, shortly before trial was to start, he expressed extreme concern with joint representation and appointed each defendant counsel to discuss the potential conflict. Before making the appointment, the trial court told defendants, "Your interests of being tried together may not be exactly the same at all points throughout the trial, and each of you is entitled to have representation completely and utterly tied to your interests and not to the other defendants." The court appointed the same counsel to advise each defendant of the issues concerning joint representation.

The trial court met with defendants and appointed counsel the following day. It asked Gove's appointed counsel: "Okay. Without, of course, telling me what you talked about, did you have an adequate opportunity to discuss the issues raised by conflict or multiple representation in this matter?" After counsel replied that he did, the court asked: "Okay. Is there anything that you can tell the Court in terms of your understanding of whether Mr. Gove wishes to proceed with Mr. Ortiz as counsel, or whether, on the other hand, he has a reservation about joint representation such that other action should take place?" Appointed counsel replied, "Your Honor, I do believe I thoroughly discussed the potential conflict issues that could arise during all the phases of the trial, and Mr. Gove

9

advises he wishes to proceed with Mr. Ortiz." Gove then affirmed he had adequate opportunity to speak with appointed counsel about the issue and he did not need more time to discuss the matter with appointed counsel or anyone else.

The trial court then took Gove's waiver. It advised him that evidence may come out at trial that could be adverse to one of the other defendants and he might want a line of questioning that counsel may hesitate to pursue because it could be adverse to the codefendants. Gove said he understood and was willing to proceed with Ortiz as counsel. Gove then affirmed that he did so voluntarily and no one coerced or twisted his arm to make him use Ortiz as counsel.

The trial court then addressed Mitchell's appointed counsel, who affirmed speaking with Mitchell about joint representation on the previous day. Appointed counsel told the court: "I advised Mr. Mitchell about the potential conflicts that could exist at really any stage of the proceedings with regard to the multiple representation and additionally inquired if he had any concerns or questions about those issues. He had also been advised by my office earlier, by Martin Jones. No new issues seem to arise, and— no new issues arose at all. And he, having been advised of potential conflicts, potential detriments, much like what the Court just discussed a moment ago, he wishes to proceed with one attorney representing all three defendants." Appointed counsel next affirmed the decision was knowing and voluntary under the same standard he applied to evaluating the voluntariness of a plea. Mitchell affirmed having an adequate opportunity to speak with counsel and affirmed his desire to be jointly represented by Ortiz. The court then took his waiver in the same fashion as it did with Gove.

Next, White's appointed counsel affirmed speaking with White about the joint representation on the day before and advising him about all of the potential conflicts that could exist in any portion of the trial. Appointed counsel told the court White discussed the matter with him and with another attorney in counsel's office, and White "thoroughly understands the potential conflicts and wishes to proceed with Mr. Ortiz." After White

affirmed having enough time to discuss the matter with appointed counsel, the trial court took his waiver.  The trial court then found all three waivers valid.

B. *Analysis*

1.

Under both the United States and California Constitutions, a criminal defendant has the right to effective representation by legal counsel.  (U.S. Const., Amend. 6; Cal. Const. art. I, § 15; *People v. Bonin* (1989) 47 Cal.3d 808, 833-834 (*Bonin*).)  "Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest.  [Citations.]" (*Wood v. Georgia* (1981) 450 U.S. 261, 271 [67 L.Ed.2d 220, 230].)  Moreover, "the constitutional guaranty protects the defendant who retains his [or her] own counsel to the same degree and in the same manner as it protects the defendant for whom counsel is appointed, and recognizes no distinction between the two.  [Citation.]" (*Bonin*, at p. 834.)  Thus, "[w]hen the trial court knows, or reasonably should know, of the possibility of a conflict of interest on the part of defense counsel, it is required to make inquiry into the matter.  [Citations.]" (*Id*. at p. 836.)

The California Supreme Court in *Bonin, supra*, 47 Cal.3d 808 further explained:

"After the trial court has fulfilled its obligation to inquire into the possibility of a conflict of interest and to act in response to what its inquiry discovers, the defendant may choose the course he [or she] wishes to take.  If the court has found that a conflict of interest is at least possible, the defendant may, of course, decline or discharge conflicted counsel.  But he [or she] may also choose not to do so: 'a defendant may waive his [or her] right to the assistance of an attorney unhindered by a conflict of interests.' [Citations.]

"To be valid, however, 'waivers of constitutional rights must, of course, be "knowing, intelligent acts done with sufficient awareness of the relevant circumstances

11

and likely consequences[,]" . . . [and] must be unambiguous and "without strings."
[Citations.]'

"Before it accepts a waiver offered by a defendant, the trial court need not
undertake any 'particular form of inquiry . . . , but, at a minimum, . . . must assure itself
that (1) the defendant has discussed the potential drawbacks of [potentially conflicted]
representation with his [or her] attorney, or if he [or she] wishes, outside counsel, (2) that
he [or she] has been made aware of the dangers and possible consequences of [such]
representation in his [or her] case, (3) that he [or she] knows of his [or her] right to
conflict-free representation, and (4) that he [or she] voluntarily wishes to waive that
right.' [Citations.]" (*Bonin, supra*, 47 Cal.3d at p. 837.)

"In determining whether a defendant understands the nature of a possible conflict
of interest with counsel, a trial court need not separately explore each foreseeable conflict
and consequence. Nor does a defendant's waiver of conflict-free counsel extend only to
matters discussed in detail on the record. As [the California Supreme Court] observed in
*Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 621, 'Rules that are that strict seem
neither necessary nor workable.' " (*People v. Jones* (1991) 53 Cal.3d 1115, 1137.)

We review the trial court's ruling on a waiver of the right to conflict-free counsel
under the abuse of discretion standard. (*People v. Baylis* (2006) 139 Cal.App.4th 1054,
1067.)

2.

White and Gove claim none of the waivers followed the proper procedure to
ensure a knowing a voluntary waiver of the right to conflict-free counsel. They assert the
waivers were invalid because they were never advised of actual rather than possible
conflict. According to them, representing all three defendants forced trial counsel to put
forward and maintain an aligned defense. They find this to be an actual conflict of
interest as joint representation prevented the presentation of alternative, individualized
defenses, such as whether the prosecution had proven Gove or White was involved in the

12

fight or had acted in defense of the other defendants. They assert advisory counsel and the court likely focused too much on divided loyalty and failed to properly consider the more subtle problem of providing independent professional judgment for a singular client. They also claim advisory counsel for each defendant should have, but failed to, determine joint representation was in the client's best interests and report this to the court with supporting reasons before an effective waiver could be made. Defendants assert the trial court also erred in failing to clarify to defendants that they could be appointed counsel free of charge to eliminate any possible fiscal reasons for joint representation. Finally, they point out that they did not waive the issue of effective assistance of counsel for a later appeal.

Defendants rely largely on *People v. Mroczko* (1983) 35 Cal.3d 86 (*Mroczko*) and *People v. Easley* (1988) 46 Cal.3d 712 (*Easley*),[4] especially for the points that they should have been advised regarding actual conflict and that advisory counsel had to determine whether joint representation was in their best interests. In *Easley*, the defendant's trial attorney (Hanson) had simultaneously represented a plaintiff (Plankington) in a federal civil suit based on the defendant's alleged burning of the plaintiff's brothel. (*Easley*, at p. 720.) Plankington was a prosecution witness in the penalty phase of the defendant's capital murder trial, as the alleged arson was introduced as an aggravating circumstance. (*Ibid*.) The conflict of interest was clear from the outset; Plankington had an interest in tying the defendant to the arson of his brothel, while the defendant needed counsel to raise doubts about his involvement. (*Id*. at p. 725.) The Supreme Court found "they had completely opposite interests concerning the same issue, and Hanson represented both simultaneously." (*Ibid.*)

---

[4]     *Mroczko* and *Easley* were disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, footnote 22.

13

The Supreme Court also found no effective waiver of this conflict. "At none of these hearings was there an indication that Hanson had discussed the conflict issue with defendant, or that defendant was offered the opportunity to discuss that matter with independent counsel. Although it appears the trial court informed defendant of his right to conflict-free counsel, defendant was never asked for a waiver. Finally, our review of the record does not reveal defendant was ever advised of the full range of dangers and possible consequences of the conflicted representation in his case." (*Easley, supra*, 46 Cal.3d at p. 730.)

*Mroczko* involved an inmate at the California Men's Colony murdered by a metal coat hanger wrapped around his neck. (*Mroczko, supra*, 35 Cal.3d at pp. 91-92.) The same trial counsel represented the two codefendants, Mroczko and Brindle, who were fellow inmates at the prison; the same counsel also represented another inmate, Hall, who was a witness to and an uncharged suspect in the victim's death. (*Id.* at p. 92.) The prosecution's case relied primarily on six witnesses, who generally testified "that Mroczko and [the victim] had been sexually involved, that they fought on the morning of May 22, 1978, that Mroczko, Brindle, and possibly Hall—another inmate—murdered [the victim], and that Mroczko made a number of damaging admissions." (*Ibid.*) The inmate witnesses nonetheless "disagreed on virtually all the particulars of the crime— especially the respective roles of Mroczko, Brindle and Hall." (*Ibid.*)

The Supreme Court reversed the first degree murder conviction finding the joint representation denied the defendant's right to effective assistance of counsel. (*Mroczko, supra*, 35 Cal.3d at p. 92.) It pointed out that joint representation prevented counsel from arguing that Hall or Brindle, rather than Mroczko, was the killer even though the only witness who identified Mroczko as the killer initially identified Brindle as the killer in his testimony while another witness identified Hall as the leader and killer while Mroczko simply watched the murder while urinating in his pants. (*Id.* at pp. 106-107.) Also, two plea agreements were offered but rejected, one had Brindle pleading as an accessory after

14

the fact in exchange for testifying against Mroczko with the other a package deal in which "Mroczko to plead guilty to second degree murder if Brindle pleaded guilty to having been an accessory after the fact." (*Id*. at p. 108.)  The attempted waivers in Mroczko were "fatally flawed in several respects.  First, the courts' comments did not fully convey a number of actual and severe conflicts that were apparent even pretrial.  Instead, each judge who addressed the defendants concerning the conflicts did so in language implying that they were merely potential conflicts.  Most importantly, however, defense counsel reinforced this notion by repeatedly—and erroneously—asserting that no conflict existed." (*Id*. at pp. 110-111.)  The trial court did not help matters by paraphrasing the prosecutor's objections to joint representation and asking each defendant "whether he understood the objection and was willing to waive the potential conflict." (*Id*. at p. 111.)  Finally, trial "[c]ounsel not only refused to admit to the conflicts that the prosecution had unearthed, but actively prevented the court and the prosecution from discovering others—particularly those between Brindle and Mroczko." (*Id.* at p. 113.)  The combination of clear conflict and flawed waiver made reversal inevitable.

This case does not involve the egregious behavior and improperly waived conflicts in *Easley* and *Mroczko*.  Unlike the trial counsel in *Easley*, trial counsel here did not have to sacrifice one client's interest to serve the other.  While, like *Mroczko*, this case involves joint representation of multiple defendants charged with participating in the same criminal attack, unlike that case, the witnesses here did not give substantially varying accounts of the defendants' relative responsibility for the crimes, and there is no evidence any defendant was offered any separate deal from the prosecution.[5]  The actions

---

[5]      The primary differences in the accounts went to who started the attack, where people were sitting at the table before the fight, and which defendants used the broken glass.  These do not rise to the level of conflict found in *Mroczko*.

15

of trial counsel, appointed conflict counsel, and the trial court in this case further distinguish the waivers here from those in *Easley* and *Mroczko*. Retained counsel here did not attempt to subvert the process that allowed the defendants to make an informed decision regarding conflicts stemming from joint representation. The trial court took the potential conflict seriously, requiring the defendants to be advised by appointed counsel on two separate occasions, and itself informed the defendants of the potential for conflict from joint representation. The record shows appointed counsel took their roles seriously by advising the defendants on the possible conflicts from joint representation, and determining their respective clients understood this and voluntarily chose to waive those conflicts and proceed with joint representation. Any conflict here was, as appointed counsel stated, potential, as it was contingent on how the case developed pretrial, during trial, and at sentencing.

We are also unconvinced by defendants' reliance on *Alcocer v. Superior Court* (1988) 206 Cal.App.3d 951. The Court of Appeal in *Alcocer* offered a set of "general guidelines" for trial courts to follow when presented with a potential conflict of interest for defense counsel. (*Id.* at p. 961.) Included in the guidelines is having the trial court "ask defendant if the only reason he is keeping his present lawyer is because of financial reasons concerning fees already paid the attorney, or fees owed the attorney. If the defendant answers 'yes' to that question, the trial court should inform defendant that if he is financially unable to retain more than one attorney, separate counsel will be appointed by the court and paid for by the government" as well as informing the defendant waiver on conflict waives any appellate claim of ineffectiveness arising out of the conflict. (*Id.* at p. 962.) This statement was purely advisory, given in the context of issuing a writ of mandate to prevent a court from prematurely recusing counsel when a waiver might be made. (See *id.* at pp. 955, 964.) While potentially useful in ascertaining whether a waiver of conflict was knowing and voluntary, neither advisement is necessary for a waiver to be valid.

16

In addition to the early written waiver, defendants gave two separate oral waivers of conflict from joint representation, both times following proper advisement by appointed counsel. No party to the waiver engaged in the type of egregious behavior regarding the potential conflict as was the case in *Easley* and *Mroczko*. We conclude defendants' waivers were valid, which precludes their contentions that the conflict prejudiced their fair trial rights.

## II

### *No Duty to Remove Counsel*

Defendants claim in the alternative that the trial court had a sua sponte duty to remove counsel when actual conflict became apparent during trial.

"While we recognize that courts should exercise their power to remove defense counsel with great circumspection [citations], they nevertheless retain the obligation to supervise the performance of defense counsel to ensure that adequate representation is provided. [Citations.] Thus, a trial judge may remove defense counsel despite the objections of the defendant and his attorney if a serious conflict of interest arises during the trial proceedings resulting in 'an obviously deficient performance. Then the court's power and duty to ensure fairness and preserve the credibility of its judgment extends to recusal even when an informed defendant, for whatever reason, is cooperating in counsel's tactics.' [Citation.]" (*People v. McKenzie* (1983) 34 Cal.3d 616, 629.)

In support of their claim, defendants state competent individual counsel would have minimized the client's role in the fight, a conflict-free attorney would have advised White not to take the stand and expose himself to impeachment with his prior convictions, and individual representation for White would cause counsel to move to sever the codefendants so they could testify in support of his self-defense claim. These arguments involve speculation about what would happen if the defendants were not jointly represented and overlook the potential benefit to defendants of maintaining a

17

united front.  Nothing during the trial shows a serious conflict leading to obviously deficient performance.**6**

## III

### *Mistrial Motion*

White contends the trial court erred in denying his mistrial motion based on the prosecutor violating a pretrial ruling and failing to provide discovery regarding his recorded pretrial statements.

A.  *Background*

Defendants filed an in limine motion pursuant to Evidence Code section 352 to exclude any reference to the defendants' clothing as "biker" clothing.  At the hearing on the motion, the trial court asked the prosecutor if he intended to offer any evidence that the defendants belonged to a motorcycle gang.  The prosecutor said he would not and would have filed gang charges if he were to.  The court denied the motion, finding the descriptor probative in light of the identification issues in the case and additionally finding it would not be unduly prejudicial.  The trial court further suggested the defense could "further ameliorate any such prejudice that is claimed by offering a limiting instruction that that evidence or description of clothing as biker clothing does not equate to membership in a motorcycle gang, if that's the concern."

On cross-examination, the prosecutor asked, without objection, whether White and the codefendants were members of the Renegade Bandits club.  White said none of them

---

**6**     Defendants also make claims regarding prejudice before the trial and at sentencing.  While the Supreme Court has stated in *McKenzie* that counsel can be removed notwithstanding the defendant's waiver due to conflicts arising during trial proceedings, we do not read this as authorizing such intrusion on a defendant's right to counsel of his or her choice due to circumstances arising before trial or at sentencing. Since there is no record of any pretrial offer nor any substantial conflict between defendants' interests at sentencing, the pretrial and sentencing claims fail even if we read *McKenzie* to include such claims.

were members.  White then admitted that he and Gove were wearing clothing that had the term "Renegade Bandits," Mitchell's clothing had no such terms on it, while his brother Paul White had the term "Green Machine" on his.  White affirmed the Renegades were a club in California and also affirmed the Green Machine was a California motorcycle club.

The prosecutor asked White, without objection, if the Green Machine was a one-percent motorcycle gang.  White answered, "They don't wear a One percent patch, but they have a bunch of tabs, yes."  The prosecutor also asked whether Green Machine are the "Vagos," which White denied.  The prosecutor began the next question by stating, "A criminal street gang," but did not finish after the trial court sustained the defense objection.  Shortly thereafter, the prosecutor asked if the Green Machine was "in no way connected to a motorcycle club" but withdrew the question after defense counsel objected.

Later, White admitted on cross-examination he was scared of Chris L., not personally but for his little brothers.  The prosecutor next asked whether White was a trained fighter, which he denied.  He was next asked whether "you want to be and aspire to be a cage fighter?"  White replied, no.  Asked if he ever told anyone on the phone it was his goal to be a trained cage fighter, White replied, "Boxer sir, through my church." The prosecutor then asked if he had any experience in bar fights; White said he did. White was then asked, "Why don't you tell me about Fort Bragg, sir?"  When White replied by asking how it was relevant, the prosecutor responded, "You got in a big brawl in a bar fight in Fort Bragg, didn't you?"

Defense counsel objected.  Defense counsel pointed out there were no motions; the trial court agreed and wanted to hear about this after the lunch recess.  When the hearing resumed, the prosecutor stated that White testified he was fearful of Chris L., which renders his prior fighting experience relevant as impeaching evidence.  The prosecutor continued:  "I've listened to his jail calls in this matter, none of which have any exculpatory information, and they indicate the following things:  Mr. White claims to

19

be an aspiring cage fighter and when he was going to get out of custody in this matter, he told some female on the phone that he wants to be a cage fighter. Then, number two, he called some male, some unidentified male, the male asked him what happened, and Mr. White said, Well, it wasn't no fucking Fort Bragg, there was laughter, ha, ha, ha, wasn't as bad as Fort Bragg. That's all I know about that incident."

Defense counsel replied that the whole line was improper because he was given no notice that jail calls were recorded or that they were intended to be used by the prosecution at trial. This prevented counsel from listening to the calls in order to determine whether White should testify at trial. Counsel also received no information about the Fort Bragg topic, a matter that would also influence the decision on whether White would testify. In addition, counsel argued the questioning about the motorcycle gang as inappropriate by tagging White as a member of a motorcycle gang. Asserting these bells cannot be unrung, counsel moved for a mistrial.

The trial court noted there was no testimony about a jail call although Fort Bragg was mentioned. It excluded the Fort Bragg reference and the bar fight under Evidence Code section 352 and ruled there would be no further references to Fort Bragg. The trial court denied the mistrial motion as it previously ruled the motorcycle evidence was relevant for identification. The court also found the testimony was relevant to establish a relationship between the defendants.

B. *Analysis*

White claims the prosecutor violated his discovery obligations by not giving over the recorded statements at least 30 days before trial. He asserts this affected his trial preparation and defense strategy, irreparably depriving him of a fair trial. He additionally claims the cross-examination regarding motorcycle gang membership violated his pretrial representations to the trial court and constituted misconduct.

A trial court should not declare a mistrial unless it is apprised of prejudice that is incurable by admonition or instruction. (*People v. Lewis* (2008) 43 Cal.4th 415, 501,

20

disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919-920.)

" 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. . . .' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175, 198-199.) " 'In reviewing rulings on motions for mistrial, we apply the deferential abuse of discretion standard.' " (*People v. Gonzales* (2011) 51 Cal.4th 894, 921.)

The prosecutor acted improperly in questioning White about motorcycle gangs and by attempting to impeach him with information the People received from recorded conversations not disclosed to the defense. The gang question contradicted the prosecutor's representation to the trial court at the in limine hearing that no motorcycle gang evidence would be introduced. Regarding the use of recorded conversations, the prosecution has a statutory duty to disclose to the defense all statements made by defendant (§ 1054.1, subd. (b)) and to disclose any of defendant's electronically intercepted communications (§ 629.70).**7** Attempting to cross-examine White based on recordings of his calls from jail without first disclosing the recording to the defense violated both provisions.

Although the prosecutor broke his word and did not comply with the discovery law, this did not result in prejudice justifying mistrial. The prosecutor asked two questions referencing a motorcycle gang, whether Green Machine was a one-percent

---

**7** While some impeaching evidence need not be disclosed by the prosecution (see *People v. Tillis* (1998) 18 Cal.4th 284, 290-291 [no duty to disclose evidence impeaching defense expert witness]) this is not, as the Attorney General contends, a blanket exemption from the disclosure of evidence simply because it may be used to impeach a defense witness. Sections 1054.1 and 629.70 both mandate the disclosure to the defense of any recorded statement made by defendant. The fact that the statement is used to impeach the defendant does not exempt the prosecution from the duty to disclose.

motorcycle gang and whether it was the Vagos, and then attempted to ask something about a criminal street gang. White's answer to the first question implicitly denied the allegation, asserting members wear tabs but not one-percenter patches, while he could not answer the second question because the trial court sustained counsel's objection. Although both questions were improper, the resulting response and sustained objection minimized any possible prejudice to the defense. Likewise, while the prosecutor should have disclosed the calls to the defense, the use of the improperly withheld information resulted, at most, in disclosing that White learned to box through church, admitting he had been in a bar fight, and a reference to Fort Bragg that was not explored after the trial court's ruling. As with the Green Machine questioning, this did not elicit such prejudice as to warrant a mistrial. Likewise, since the trial court's ruling on the Fort Bragg incident effectively shut down this line of questioning soon after it started, the failure to disclose did not significantly impair the preparation of the defense or the decision to have White testify. While the prosecutor also referenced White being a boxer in closing argument, for the reasons discussed in part IV of the Discussion, *post*, those references likewise are not prejudicial.

In light of the minimal prejudice here, denial of the mistrial motion was within the court's discretion.

IV

*Prosecutor Misconduct*

White asserts the prosecutor also committed misconduct by repeatedly asking other improper questions during cross-examination and by improper arguments during closing.

A. *Cross-Examination and Closing*

During cross-examination, White testified that his brother Paul saw Chris L. grab White's throat but admitted Paul was not called as a witness. The prosecutor then asked, "Why don't you tell the jury why not? He seems like an important witness to this case."

22

The trial court sustained the defense objection. A little later, the prosecutor asked, "Isn't it true, sir, that you are paying for the defense of both of these individuals over here?" The court sustained the defense objection.

Later, when asked whether he told the investigating officer the truth, White replied, "Yeah to my best ability, you know, from what I remember, I told him that." The prosecutor responded, "What is your best ability? Are you a quasi-liar or a full liar?" Defense counsel objected; White replied he was not a liar before the trial court sustained the objection. The prosecutor next asked, "Who are these people grabbing ass, as you told the jury on your direct examination?" White denied doing so before the trial court sustained the defense objection. The prosecutor then asked, "Did you ever tell this jury that all the people were grabbing ass?" White replied, without objection, "No. I don't remember saying that."

During closing, the prosecutor called White "someone who trains to be a boxer" and that he lied when he said he was scared of Chris L. He also argued Chris L. wanted to do the right thing but was given a "beatdown by three punks" and then concluded the closing by asking the jury to convict the defendants. During rebuttal, the prosecutor asserted defense counsel did not argue that Chris L. went for the neck because counsel knew it was not true. He also reiterated that White lied when, as a trained boxer, he claimed to be scared of Chris L. and the jury should reject his testimony under CALCRIM No. 226. The prosecutor concluded the rebuttal by arguing, "There's two ways to look at this case: Through the eyes of a liar or through the eyes of [Chris L.] I think you'll do the right thing. Thank you." Trial counsel did not object to any of the prosecutor's arguments.

B. *Analysis*

White claims the prosecutor, by creating a dichotomy of believing a liar (White) or Chris L., essentially vouched for Chris L. while disparaging White. He also finds the closing argument improperly took advantage of the discovery violation by referring to

23

White as a trained boxer.  White further asserts arguing counsel did not believe White's testimony that Chris L. went for his neck is likewise improper.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.  Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.  [Citation.]" (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom.  [Citations.]" (*People v. Morales, supra,* 25 Cal.4th at p. 44.)  "Within the scope of permissible prosecutorial argument, a prosecutor is given wide latitude during argument ' " ' "as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. . . ." ' " ' [Citation.]" (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1529.)  "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citation], and he may 'use appropriate epithets warranted by the evidence.' [Citations.]" (*People v. Fosselman* (1983) 33 Cal.3d 572, 580.)

Regarding the allegedly improper cross-examination, the trial court sustained defense objections to all of the prosecutor's questions except one, "Did you ever tell this jury that all the People were grabbing ass," to which White replied, "No.  I don't remember saying that."  "It is not misconduct to ask a question in good faith even if the court exercises its discretion by sustaining an objection." (*People v. Chatman* (2006) 38 Cal.4th 344, 405.)  Even assuming some of the allegedly improper questions were not asked in good faith, the sustained objections prevented the defendant from being

24

prejudiced, forestalling any claim of reversible misconduct. The remaining question neither vouched for Chris L. nor disparaged White and is not so deceptive or reprehensible as to constitute misconduct under state or federal law, assuming the failure to object does not forfeit the contention.

Failure to raise a claim of prosecutorial misconduct at trial forfeits the issue on appeal unless doing so would be futile or the misconduct could not be cured by admonition. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) Recognizing there was no objection to any of the allegedly improper argument, White claims we should consider his contentions because an objection and admonishment would not have cured the jury hearing what the prosecutor said about White being a liar and a punk and about defense counsel not believing White. The alleged misconduct was not too severe to be cured through objection and admonition. Since White also claims the failure to object constituted ineffective assistance of counsel, we still consider the claim.

The arguments asserting White was a liar and Chris L. was telling the truth are not misconduct. While a prosecutor may not urge "the jury [to] draw inferences concerning defendant's guilt from conclusions regarding defendant's general bad character," the prosecutor "is entitled to make a vigorous argument, and 'opprobrious epithets' may be employed if 'reasonably warranted by the evidence.' [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 774.) Likewise, referring to a defendant's testimony as " 'lies' is an acceptable practice so long as the prosecutor argues inferences based on evidence rather than the prosecutor's personal belief resulting from personal experience or from evidence outside the record. [Citations.]" (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1030.) The same is true regarding arguments that a prosecution witness is telling the truth. While a prosecutor cannot personally vouch for or place the prestige of his or her office behind a witness, " 'so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal

25

knowledge or belief," [his or her] comments cannot be characterized as improper vouching. [Citations.]' [Citation.]" (*People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1269-1270.) The prosecutor's argument regarding the relative veracity of White and Chris L. was based on proper inferences from the facts, and it is within the wide latitude offered prosecutors in closing to call White a liar and a punk.

The argument that defense counsel did not believe White's story that Chris L. went for the neck and arguments referring to White as a boxer were improper. "It is improper for a prosecutor to argue to the jury as an analysis of the defense argument or strategy that defense counsel believes his client is guilty. [Citation.]" (*People v. Bell* (1989) 49 Cal.3d 502, 537.) Arguing defense counsel did not believe White's testimony improperly raises the irrelevant argument about defense counsel's belief in the client's guilt. As we discussed in the previous section, the prosecutor had a duty to disclose White's statements in the recorded conversations from jail. Since the line of questioning which elicited White's statement that he took boxing through church was derived from these recorded statements, argument referring to this information was improper.

A claim of ineffective assistance requires defendant to show substandard performance and prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-692 [80 L.Ed.2d 674, 693-696].) To establish prejudice, "the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 389.) A single improper reference to defense counsel's lack of belief in the defendant's testimony is not so prejudicial that it could not have been cured by an admonition. (See *People v. Bell, supra*, 49 Cal.3d at p. 538 [argument that defense counsel did not believe the defendant not so prejudicial that it could not be cured by admonition].) It also lacks the prejudice to satisfy *Strickland*'s second prong. The same is true of the reference to White as a boxer. Multiple eyewitnesses identified the defendants as the aggressors. The single reference in argument to White being a boxer

does not establish a reasonable probability of a different result had there been an objection. The claim of ineffective assistance is without merit.

V

*Impeaching With Prior Convictions*

White next claims it was improper to allow the prosecutor, over the defense's objection, to impeach him with three prior convictions from 2006 for unlawful possession of a weapon. (Former § 12020, subd. (a)(1).) We disagree.

Subject to the trial court's discretion under Evidence Code section 352, a witness's prior felony convictions for crimes involving moral turpitude are admissible to impeach. (Evid. Code, § 788; *People v. Green* (1995) 34 Cal.App.4th 165, 182.) We review for abuse of discretion a trial court's decision whether to admit prior felony convictions for impeachment purposes. (*Green*, at pp. 182-183.) " 'A trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered. [Citation.]' [Citation.]" (*Ibid.*)

A prior felony conviction is "admissible for impeachment if the least adjudicated elements of the conviction necessarily involve moral turpitude." (*People v. Castro* (1985) 38 Cal.3d 301, 317.) "Moral turpitude" has been defined as a " 'readiness to do evil,' " and "moral depravity" (*id.* at pp. 314-315) and "includes 'conduct involving violence, menace, or threat.' [Citations.]" (*People v. Williams* (1999) 72 Cal.App.4th 1460, 1464.)

White claims the convictions were not crimes of moral turpitude because he could be guilty of mere unlawful possession of a prohibited weapon without a specific intent to use it.

At the time White suffered the priors in question, former section 12020, subdivision (a)(1) prohibited the possession, manufacture, or sale of "any undetectable

27

firearm," ammunition such as "any flechette dart, any bullet containing or carrying an explosive agent," and various other weapons such as sawed-off shotguns, metal knuckles, and blackjacks. (Former § 12020, subd. (a)(1).) The purpose of this section is to outlaw a class of instruments normally used only for criminal purposes. (*People v. Wasley* (1966) 245 Cal.App.2d 383, 386.) Notably excluded from the list of proscribed items are those possessed for an "innocent" purpose. The mere possession of such disguised items evidences the possessor's evil intent and establishes the offense as one involving moral turpitude. (See *People v. Garrett* (1987) 195 Cal.App.3d 795, 800; see also *People v. White* (1992) 4 Cal.App.4th 1299, 1304 [possession of illegal weapon is moral turpitude]; *People v. Littrel* (1986) 185 Cal.App.3d 699, 703 [possession of a concealable firearm by a felon involved moral turpitude].) Hence, violation of former section 12020 is a crime of moral turpitude.

White relies on federal circuit court authority for the proposition that an unlawful weapon possession crime must have a specific intent requirement before it can be considered a crime of moral turpitude. (See *Hernandez-Gonzalez v. Holder* (9th Cir. 2015) 778 F.3d 793, 799-800.) California courts are not bound by federal circuit court decisions. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3.) We decline to follow *Hernandez-Gonzalez* as it is contrary to California law. It was not an abuse of discretion to admit the three weapons convictions.

VI

*Reversal of Lesser Included Offense*

Gove contends his conviction for simple assault in count one should be reversed because it is a lesser included offense of his assault by means likely to produce great bodily injury. White joins the claim.

"In California, a single act or course of conduct by a defendant can lead to convictions 'of *any number* of the offenses charged.' [Citations.] But a judicially created exception to this rule prohibits multiple convictions based on necessarily included

28

offenses.  [Citations.]"  (*People v. Montoya* (2004) 33 Cal.4th 1031, 1034.)  Where the exception applies, conviction for the lesser offense must be reversed.  (*People v. Ortega* (1998) 19 Cal.4th 686, 692.)

To determine whether an offense is necessarily included in another, we apply the elements test, asking whether " ' "all the legal ingredients of the corpus delicti of the lesser offense [are] included in the elements of the greater offense." [Citation.]' [Citations.]"  (*People v. Lopez* (1998) 19 Cal.4th 282, 288.)  In other words, "if a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.  [Citations.]"  (*Ibid*.)

Simple assault is an unlawful attempt, coupled with the present ability, to commit a violent injury on another person.  (§ 240.)  Simple assault is a lesser included offense of assault by means of force likely to produce great bodily injury.  (Pen. Code, § 245, subd. (a)(1); *People v. McDaniel* (2008) 159 Cal.App.4th 736, 739, 747.)

As we determine in resolving defendants' section 654 claims, see part VII of the Discussion, *post*, the simple assault, simple battery, and assault by means counts are part of an indivisible course of conduct with a single objective.  The cases cited by the Attorney General do not address the lesser included offense exception to the multiple conviction rule.  (See *People v. Gonzalez* (2014) 60 Cal.4th 533, 539 [convictions for §§ 288a(f) and 288a(i) did not implicate the lesser included offense rule as "neither offense is included within the other"]; *People v. Schueren* (1973) 10 Cal.3d 553, 555-557, 561 [the defendant convicted of lesser included offense; cruel and unusual punishment to impose greater punishment than the maximum term for the greater offense]; *People v. Liakos* (1982) 133 Cal.App.3d 721, 723, 725 [addressing § 654 claim].)

We shall reverse the convictions in count one.  Gove points out the section 1465.8 court operations assessment must be reduced by $40 and the Government Code section 70373 criminal conviction assessment must be reduced by $30 as both assessments are

imposed on a per conviction basis. We shall order the trial court to reduce both assessments.

## VII

### *Section 654*

White and Gove contend the sentencing on the simple assault (count one) and simple battery (count three) counts should have been stayed pursuant to section 654. The Attorney General concedes the point. We agree that count three should be stayed. Since we reverse count one, a stay is unnecessary.

Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." While the statute literally applies to multiple punishment arising from the same act or omission, it has been extended to cases where there are several offenses committed during a " ' "course of conduct deemed to be indivisible in time." ' " (*People v. Hicks* (1993) 6 Cal.4th 784, 789.)

"Whether a course of conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the 'intent and objective' of the actor. [Citation.] If all of the offenses are incident to one objective, the court may punish the defendant for any one of the offenses, but not more than one. [Citation.] If, however, the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct. [Citation.]" (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267-268.) "We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

The simple battery and assault by means likely to produce great bodily injury were part of a single course of conduct with one objective, assaulting Chris L. because of their dispute concerning serving alcohol to Mitchell. We shall modify the judgment to stay sentence on count three.[8]

## DISPOSITION

Defendants' convictions for simple assault in count one is reversed and sentence for simple battery in count three is stayed pursuant to section 654. As modified, the judgment is affirmed. The trial court is directed to reduce the court operations assessment by $40 and the criminal conviction assessment by $30. The trial court is further directed to prepare an amended abstract of the judgment reflecting the modified judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.

_____/s/_____
BLEASE, Acting P. J.

We concur:

_____/s/_____
MURRAY, J.

_____/s/_____
RENNER, J.

_____

[8]     The Attorney General contends the abstract incorrectly states Gove's two-year term was imposed for simple assault (count one) rather than assault by means likely to produce great bodily injury (count two). Not so. This claim is based on an earlier abstract. The most recent abstract correctly identified that Gove's felony sentence is for assault by means likely to produce great bodily injury in count two. Since the court will be issuing an amended abstract, we assume it will again be error free.

31